John Drake et al. *v.* John C. Rogers

L died seized of lands, leaving his widow, C, and their only child, M, to whom the lands descended. M died seized of lands, without issue, and without brother or sister, and on her death the lands descended to her father's next of kin; subsequently her mother, C, married again, and had a son, J, the plaintiff, who seeks to recover the lands as half brother and heir of M. Held: That under the act of the 14th of March, 1853, the inheritance vested in the father's next of kin, did not shift on the birth of the half brother, and that such half brother is not entitled to recover the lands.

Error to the court of common pleas of Warren county Reserved in the district court.

The defendant in error, John C. Rogers, an infant, by

Robert R. Rogers, his next friend, on the 19th day of March, 1859, filed his petition against the plaintiffs in error, in the court of common pleas of Warren county, for the recovery of possession of certain lands, particularly described, situate in said county. The petition is in the ordinary form under the code.·

The plaintiffs in error, defendants below, answered the petition, denying the plaintiff's seizen or ownership. Judgment was rendered for the plaintiff in the court of common pleas at its July term, 1860.

The bill of exceptions, taken in the common pleas, presents the following agreed statement of facts :

"It is agreed by the parties to this suit, as follows : About the 29th July, 1849, Thomas Clayton died seized in fee simple of the real estate described in the petition, leaving an only child and heir at law, viz : Lewis W. Clayton, the only child of said Thomas Clayton and Polly Drake Clayton, his ·wife; who was a daughter of Lewis Drake, deceased, and a sister of the defendants in this case. The said Polly Drake Clayton died before her said husband, Thomas Clayton. To said Lewis W. Clayton, said premises descended in fee simple· on the death of his said father.

"Lewis W. Clayton intermarried with Christina Meloy in the year 1843, and had by her one child, Mary Margaret Clayton, born in 1844.

"Said Clayton (Lewis W.), never had any other child, and died in June, 1851, leaving surviving him his said widow, Christina, and his said child, Mary M. Clayton, his only child and heir at law, to which said child said real estate descended in fee simple, subject to the dower of said Christina. In the month of March, 1856, said Mary M. died an infant, unmarried, intestate and without issue. After the death of said Mary M. Clayton, the defendants or a part of them on the 5th June, 1856, filed in Warren common pleas court a petition for the assignment of dower in the premises described in the petition, of which said Mary M. Clayton died seized, and for the partition of the same among these defendants, they being the children of said Lewis Drake, and the brothers and

sisters to the wife of said Thomas Clayton, deceased, as aforesaid, under which said proceeding, dower was assigned to Christina, and the premises being appraised were sold under the order of said court, and the defendant, John Drake, became purchaser thereof, and at the April term, 1857, of said court, said sale was confirmed to said John Drake, as trustee for the parties in interest, and possession taken by him of said premises described in the petition.

" On the 21st May, 1857, said Christina Clayton intermarried with Robert Rogers, and on the 10th March, 1859, the plaintiff, John C. Rogers, the son of said Christina and Robert Rogers, was born ; and on the 24th April, 1859, the said Christina Rogers died, having never had any children but the said Mary M. Clayton and the said John C. Rogers, the plaintiff. This agreement is only made for and to bind the parties in this case."

Upon this agreed statement of facts, the court of common pleas found that the plaintiff was seized in fee simple, and entitled to the immediate possession of the premises; and rendered judgment in his favor for the same and for costs ; to which finding and judgment the defendants excepted ; and to reverse the same filed their petition in error in the district court, wherein the case was reserved to this court for decision.

*Taft & Perry*, for plaintiffs in error, argued the following points :

1. The common law doctrine of " shifting inheritances," has no just application to the statute of descents and distribution of Ohio. The decision in the case of *Dunn* v. *Evans*, 7 Ohio Rep. 169, was unsound, and did violence to the language of the statute of 1824, under which that case arose.

2. If shifting inheritences could be sustained under the act of 1824, they are excluded by the language of the act of 1853.

*A. G. Thurman* and *J. M. Smith*, for defendant in error, argued :

I. *Dunn* v. *Evans*, 7 Ohio Rep. Pt. 1, 169, is decisive of this case.

II. That decision ought not to be overturned. For,

1. It has been a rule of property for nearly twenty years. Indeed, there has never been any other rule in Ohio.

2. It is fully sustained by authority. 1 Co. Litt. 11 b.; 2 Bla. Com. chap. 14, and Christian's note (11); 3 Cruise's Dig 230; 3 Wils. 516; 3 Atk. 203; *Cutler* v. *Cutler*, 2 Hawks (N. C.), 324; *Rutherford* v. *Wolfe*, 3 *id*. (N. C.) 272; *Rutherford* v. *Green*, 2 Iredell's Eq. Rep. 121; *Caldwell* v. *Black*, 5 Iredell, 463; *Goodwin's Lessee* v. *Keerl*, 3 Har. & McH. 403; *Barnitz's Lessee* v. *Carey*, 7 Cranch, 468.

3. It is more consistent with the spirit of our institutions, the feelings of our people, and the policy of our laws, and especially those of late date, than the rule claimed by the plaintiffs in error. The whole tendency of our modern legislation has been to prefer, beyond what was formerly the case, nearness of blood, or even of affinity, to remote collaterals of the blood of the ancestor from whom the estate came.

III. The statute of descents of 1853 does not change the law in the particular under consideration.

1. Statutes are unwillingly construed to be in derogation of the common law. This is a rule here as well as in England.

2. Laws established by statute are not altered by subsequent statutes, unless the intention to do so is manifest. The language of the subsequent statute must be clear, in order to have that effect. And this is especially true where the former statute has received a judicial construction. It is so even in the case of remedial laws. *Boley* v. *Ohio Life Insurance and Trust Company*, 12 Ohio St. Rep. 139. But of all cases, that in which the former statute related to the transmission of real estate, and the judicial construction had become a rule of property, is *the* case for the application of the rule. 11 Ohio St. Rep. 12; *Ash* v. *Ash*, 9 Ohio St. Rep. 387–418, and cases cited.

3. There is no language in the act of 1853 that operates a change of the law in the particular under consideration.

Where this act *does* change the former law, its language is clear and its intention manifest.

SUTLIFF, C. J.—The plaintiffs in error claim to have derived titled to the lands in controversy by inheritance from Mary Margaret Clayton, at her death, in March, 1856, under the statutes of descents, passed March 1853, then in force. That act provides as follows:

" SEC. I. That when any person shall die intestate, having title or right to any real estate of inheritance in this state, which title shall have come to such intestate, by descent, devise or deed of gift from any ancestor, such estate shall descend and pass in parcenary to his or her kindred in the following course:

" *First.*—To the children of such intestate, or their legal representatives.

" *Second.*—If there be no children, or their legal representatives living, the estate shall pass to the brothers and sisters of the intestate, who may be of the blood of the ancestor from whom the estate came, or their legal representatives, whether such brothers and sisters be of the whole or half blood of the intestate.

" *Third.*—If there be no brothers or sisters of the intestate, of the blood of the ancestor from whom the estate came, or their legal representatives, and if the estate came by deed of gift from an ancestor, who may be living, the estate shall ascend to such ancestor.

" *Fourth.* If the ancestor from whom the estate came be deceased, the estate shall pass to, and vest in the husband or wife, relict of such intestate, during his or her natural life.

"*Fifth.* If such intestate leave no husband or wife, relict of himself or herself, or, at the death of such relict, the estate shall pass to, and vest in the children of the ancestor from whom the estate came, or their legal representatives; if there be no children of such ancestor, or their legal representatives, the estate shall pass to and vest in the brothers and sisters of such ancestor or their legal representatives, and for want of such brothers or sisters, or their legal representatives, to the

brothers and sisters of the intestate of the half blood, or their legal representatives, though such brothers and sisters be not of the blood of the ancestor from whom the estate came.

" *Sixth*. If there be no brothers or sisters of the intestate or their legal representatives, the estate shall pass to the next of kin to the intestate of the blood of the ancestor from whom the estate came."

" Sec. II. That if the estate came not by descent, devise or deed of gift, it shall descend and pass as follows:

" *First*. To the children of the intestate and their legal representatives.

" *Second*. If there be no children or their legal representatives, the estate shall pass to, and be vested in the husband or wife, relict of such intestate, during his or her natural life.

" *Third*. If such intestate leave no husband or wife relict of himself or herself, the estate shall pass to the brothers and sisters of the intestate of the whole blood and their legal representatives.

" *Fourth*. If there be no brothers or sisters of the intestate of the whole blood; and their legal representatives, the estate shall pass to the brothers and sisters of the half blood and their legal representatives.

" *Fifth*. If there be no brothers or sisters of the intestate of the half blood or their legal representatives, the estate shall ascend to the father; if the father be dead, then to the mother.

" *Sixth*. If the father and mother be dead, the estate shall pass to the next of kin to and of the blood of the intestate."

" Sec. III. When any person shall die intestate, having title or right to any real estate, and there shall be no person living entitled to inherit the same, by the provisions of this act, the said real estate shall pass to and be vested, as an estate of inheritance, in the husband or wife, relict of such intestate; and if there be no such relict, it shall escheat to and be vested in the State of Ohio."

The plaintiffs in error claim to have derived a perfect inde-

feasible estate in fee simple in said lands, under the agreed statement of facts, by force of the *sixth* clause of section I of the foregoing statute.

It appears from the agreed statement of facts that the estate of which Mary M. Clayton so died seized, came to her by descent; that she died intestate in March, 1856, without any child, brother or sister or their legal representatives, and leaving the plaintiffs in error her next of kin.

It is quite apparent that from the agreed statement of facts the plaintiffs in error are within the statute, as the persons designated to whom the estate descended on the death of Mary Margaret in March, 1856. Indeed, it is not denied on the part of the defendant in error, that by force of the statute the title to the lands, at the time of the death of the said Mary Margaret, became vested in and the descent cast upon the plaintiffs in error.

But the counsel of defendant in error say, that although by force of the statute, the descent at the decease of Mary M. was cast upon the plaintiffs in error; that afterward, on the 10th day of March, 1859, upon the said John C. being born, by the common law doctrine of shifting inheritances, the plaintiffs in error became divested of the title, and the same became vested in the defendant in error under the last part of clause *fifth* of section I, of said act.

To this it is replied by counsel of plaintiffs in error, that the common law doctrine of shifting inheritances has no just application to the statute of descents and distribution in Ohio.

On the part of the defendant in error, it is insisted that this common law doctrine of shifting inheritances always has been, and still is in full force in this state. And upon this single issue between counsel, the case before us hinges.

If the course of descents is to be regarded as prescribed and controlled only by statute law in this state, then the inheritance still belongs to the plaintiffs in error; but if the language of the statute is not in exclusion of, but subject to, the common law doctrine of shifting inheritances, then the inheritance by the law of this state belongs to the defendant

in error.   The important fact, therefore, to he ascertained is, whether or not, at *the time* (March 1856), when Mary Margaret died, the common law doctrine of shifting inheritances obtained in this state.   For if it did, the descent cast by the death of the intestate upon the plaintiffs in error, was subject to and controlled by that common law doctrine as well as the statute.

It was provided by the act of October 1, 1795, chap. 64 of territorial laws, " that the common law of England, all statutes or acts of the British parliament made in aid of the common law prior to the fourth year of the reign of King James the First (and which are of a general nature, not local to that kingdom), and also the several laws in force in this territory shall be the rule of decision, and shall be considered, as of full force, until repealed by legislative authority, or disapproved of by Congress."

The expression " until repealed by legislative authority," would.seem to imply that the common law of England and the statutes and acts of parliament so made of full force by this statute, would cease to be in force upon its repeal.

By an act of the legislature of Ohio, passed January 2, 1806, it was enacted (chap. 122) " Sec. I. That so much of the act entitled ' an act declaring what laws shall be in force in this state," as declares the common law of England, and the statutes or acts of the British parliament made in aid of the common law prior to the fourth year of the reign of King James the First, to be in force as the rule of decision in this state, be and the same is hereby repealed: *Provided*, nevertheless, that all suits and prosecutions now pending in any court of record within this state under the provisions embraced in the above recited act, shall be prosecuted to final judgment and execution in the same manner as though this act had never been in force.   This act. to take effect and be in force from and after the passage thereof."

So far, then, as the common law of England and the statutes of the British parliament were made operative as law in this state by the act of October, 1795, the same ceased to be operative as law in Ohio, by force of the act of January 2,

Drake et al. *v.* Rogers.

1806. It does not, however, follow from these acts of the legislature, that the common law of England is not of force in this state. To the same extent, that it would have been in force, if the act of 1795 had never been enacted, the common law of England has doubtless continued to be recognized as the common law of this state.

In the absence of legislative enactments and as auxiliary to, and for the enforcement of such enactments, and so far as the reason of its rules remained applicable to our condition and circumstances as a people, the common law of England has always been received and accepted as the common law of this state. Indeed, a common law, which is only another expression for general rules, is indispensable to a perfect system of jurisprudence. It is even necessary in order to give effect to, and administer remedies and statutory enactments. But wherever the legislature has by statutory law assumed to establish either rules of property or conduct, it has always been the policy of the law in this state, or at least such is the generally received understanding, that the common law can neither add to nor take from the statutory rules so established. The office of the common law in such cases, is only to minister aid, and facilitate the application of the statutory rule and remedy ; not to supply any other or different one. Thus, at the first term of the general court held by the governor and judges under the ordinance of 1787, there was enacted for the territory " a law respecting crimes and punishments " (chap. 6, Ter. Laws), in which they provided the appropriate penalty to various crimes and misdemeanors, particularly expressed. This act has, at different times, been revised and amended down to the present time. But the legislature, having assumed to define by statute what acts should be regarded criminal (except during the short period that the act of Oct. 1795, continued in force), common law offenses have never been recognized in this state; nor is the common law, for the same reason, in force for the punishment of crimes in this state, except in aid of the statute ; there having been a statutory provision upon that subject. The same remark holds equally true in relation to the

application of the common law in civil cases wherever the legislature has assumed to establish a statutory rule. The subjects of wills, dower, deeds of conveyance and mortgages, will each be found, as well as many other subjects, very illustrative of the same policy, which has generally been adhered to in this state; that is, in no case where the legislature has attempted to furnish a rule of property, to suffer such rule to be defeated, enlarged or restricted by any common law rule applicable to the same subject.

But there is scarcely any subject which in this state has received earlier or more careful and continued attention from the legislature than that of the descent or inheritance of estates of deceased persons. The first law enacted by the legislature, that of June 16, 1795 (chap. 50), entitled " a law for the settlement of intestate estates," very clearly shows that the legislature intended to furnish a statutory rule by which alone the estate should descend, and be inherited and enjoyed. That act did not distinguish between the personal and the real estate. It provided that the estate, after taking into consideration advancements, if any had been made, so as to produce equality, should descend to the children. " And in case there be no child, then to the next of kin in equal degree, of, or unto, the intestate and their legal representatives as aforesaid; and in no other manner whatsoever."

This statutory rule of descent by its terms as well as by its express provisions—" in no other manner whatsoever "— was evidently designed to be altogether independent of the canons of descent or of the common law rule, and to constitute of itself, a perfect and absolute rule of descent and title to property. And if this be questioned as to real estate, it certainly must be equally liable to question as to the personal estate embraced in the same act. In either case, it may alike be objected that the provision that the estate shall descend " to the next of kin in equal degree, * * * and in no other manner whatsoever," is inconsistent with the idea of superadding to the statutory rule so provided the English rule of shifting inheritances, as another manner by which also the estate may descend.

And this statutory rule of descent, as revised by the act of February 22, 1805 (chap. 109), entitled " an act regulating the course of descents and distribution of personal estates," was made still more ample and explicit; and from that time to the present, under all the several revisions and amendments, the statutory rule of descents has always assumed to be the only rule of descent and property applicable to the estates of intestates in this state. Thus the supreme court in remarking upon our statute of descents, in the case of *Penn and others* v. *Cox and others*, 16 Ohio Rep. 32, say, " We understand the ' act regulating descents and the distribution of personal estates,' as embracing the whole subject, and intended to provide for all possible cases," etc.

The same views of statutory rules of descent have been entertained and expressed by the courts of other states. The statute of October 1, 1795, already referred to, making the common law of England and certain acts of the British parliament for a time in full force in this state, was a mere transcript of a statute of Massachusetts, which for a time continued in force in that state as well as in this. Yet in the case of *Sheffield* v. *Lovering*, 12 Mass. Rep. 490, we find the supreme court of that state expressing the same views of the statutory rule of descents, afterward expressed by our court in 16 Ohio Rep., above referred to. A rule of the common law in relation to descents was there insisted upon. But its application in that state, where a statutory rule had been established upon the same subject, was questioned and denied by opposite counsel. Jackson, J., in delivering the opinion of the court, says : " This could not be made a question at the common law ; but with us, from the first settlement of the country, the rules of the descent and distribution of real and personal estate have generally been alike, and they depend wholly on our own statutes."

It must, however, be admitted that the case of *Dunn* v. *Evans*, 7 Ohio Rep. 169, is opposed to the views here expressed. Judge Lane, who pronounced the opinion of the court in that case, does not seem to have remarked upon the distinction in the application of the common law doctrine of

shifting inheritances between cases of statutory enactment, and an absence of legislation upon the subject, nor between common law rules really applicable, and those inapplicable to the condition and circumstances of our people. The facts in that case were quite analogous to those in the case before us. And, although the case arose under the statute of February 11, 1824, differing somewhat, as will be afterward herein shown, from the statute of 1853, under which this case arises, it must be admitted that, so far as respects the foregoing objections to admitting the rule of shifting inheritances, the two statutes should be regarded as identical. But I have said the principles and the limitations mentioned as properly governing in the application of the common law of England to our system of jurisprudence was not remarked upon by the judge, in the opinion delivered in that case. It may also be added that the case as reported, bears no evidence of preparation by counsel, or any opportunity for a careful and full consideration by the court. No counsel are named in the report for either party. Nor are there any propositions submitted or authorities cited, either on the part of the plaintiff or the defendant. And the only authorities referred to by the court to sustain their opinion as expressed, are Coke's Lit. 2, 6; 3 Cruise's Dig. 230; 3 Wils. 516, and 3 Atk. 203; and Tucker's Blackstone (ed. 1803), 2 Appendix 12, all of which, so far as they relate at all to the case, are merely to the effect that the doctrine of shifting inheritances is recognized in England as a rule at common law, applicable to estates by inheritance; or at least is an incident of their rules.

The facts in that case may be briefly stated thus: James F. Penn, a posthumous child, was born on the 18th day of January, 1831, and inherited the lands in fee, subject to the dower of his mother, and died on the 20th day of the same month, leaving the lands to uncles perhaps, who, under the statute of 1824, then in force, were his lawful heirs, as their being "next of kin," and entitled to the lands as an estate of inheritance. Afterward, the mother of the infant intestate intermarried with William Evans, and on the 14th of December, 1833, there was born of that marriage her son,

Ather Evans, for whom claim was made to said lands so having descended to the uncles about four years previous to the birth of the claimant, upon claim that said Ather was nearest of kin to the intestate.

Judge Lane, upon this state of facts, expressed the following opinion : " The fourth clause of the statute of descents of 1824, then in force, preferred the brothers and sisters of the intestate of the half blood, to the next of kin of the intestate." * * * " So that in this case, if Ather Evans, the brother in the half blood of James F. Penn had been living at the time of his death, the land would have descended to him. And it makes no difference with the right of Ather Evans, that his birth occurred after the death of James F. Penn. Although lands descend to him who is heir at the intestate's death, by the operation of the feudal rule, that the freehold should not be in abeyance, this descent may be defeated at any time by the birth of a nearer heir."

The judge, in this opinion, gives no force to the statute, except to designate the heir, and refers the transmission of the estate entirely to the operation of the feudal rule that the freehold should not be in abeyance ; and so, instead of regarding the title as passing to and vesting in the next of kin of the intestate, when any person shall die intestate, leaving an estate of inheritance, according to the provision and by force of the statute, the opinion seems to regard the effect of the statute as merely lodging the title in the person designated by the statute as entitled to the estate on the death of James F. Penn ; and then asserting the unqualified force of the rule or incident of the feudal system, that of shifting inheritances, by which the learned judge affirms " this descent" (so fixed and declared by statute law of this state), " may be defeated at any time upon the birth of a nearer heir," etc.

Indeed, this construction of our statutes of descent seems to me quite inconsistent with their true object and office. I have always supposed the object of our statutes of descent to be to determine and point out the representatives of the person dying intestate, having title to any real estate of in-

4

heritance within this state. I have always regarded the office of our statutes of descent to be to invest the representatives of the intestate *instanter*, upon the death of the intestate, with the *same* title of which the intestate died seized. And when the statute has done this, its office is fully discharged in that case, and it becomes *functus officio* as to such intestate's property; and can only be again called into operation to transmit the title of the same property, upon such repre sentative dying intestate, and seized of the property. In such a case, the statute may again designate and determine *his* representatives, and in like manner transmit the same property to them. But I deny that after the title, by force of the statute, has been transmitted to and vested in the legal representative, at the time of the death of the intestate, the statute of descents, before he shall die intestate, and while he is yet living and seized of said lands, in fee simple, operate to divest him of such title, and transmit the title to another person. Under the laws of this state, I think it is contemplated that such change of title, from one living person to another, is to be made by deed, duly executed, rather than by our statutes of descent.

Whether the title to lands, in this state, be acquired by purchase and deed of conveyance, or devise executed according to the statute laws of the state in such cases made and provided, or whether the title to lands be acquired by descent or hereditary succession, according to the provisions of the statute laws of the state in such cases made and provided, the person so acquiring the title, according to the provisions of the statute, alike in either case holds the title thus acquired, as perfect and indefeasible as it was in the person from whom he so acquired it. An heir's title, under our statute, upon reason and authority, ought to be as perfect as it would have been by deed of gift from the ancestor at the time of his decease, passing the title from him while yet living. An heir being the person upon whom the law casts the estate, immediately on the death of the ancestor, would only take the titlé upon the death of the ancestor, while the grantee in the case supposed would take the title immedi-

ately before the death of the ancestor. Yet both the heir and grantee, in the cases supposed, would, by force of the statute law of this state, have acquired all the right and title held by the ancestor. And, in each case, the party would hold his title without having paid value, but by acquiring the title according to the statute. And, in either case, after having so lawfully acquired the title, the party would, by the law of the state, be the legal owner of the property.

It is certain that our statutes assume to provide and direct as well how the title of lands shall pass by descent as by devise and deed. The provisions are as explicit in relation to the acquisition of the title by hereditary succession or descent, as under purchase by deed or devise. Indeed, our statutes assume to furnish, for every possible case, a rule by which alone title to lands can be acquired in this state.

While, therefore, our statutory rules of descent reject the canons, and supersede the common law rules of inheritance, it seems hardly a logical conclusion that the same statutory rule is to be itself superseded by a common law rule of descent, much less by the doctrine of shifting inheritances, a mere incident of the canons of descent. And this seems more especially so, from the consideration that the canons of descent existing in England as the common law rules of descent were rejected, or rather never adopted, in this state, for the reason that they were not adapted to our circumstances.

It is well understood that this common law doctrine, or incident of the canons of descent, had its origin in the feudal system, and from that system alone is to be derived the reasons for its support. Under that system, the allodium was regarded as being in the lord paramount or king; and the occupants, the landholders, were regarded in law as only tenants. The feudal system is not only not adapted to our condition and circumstances as a people, but it is utterly and irreconcilably at variance with our institutions and government. It is, therefore, difficult to perceive any satisfactory reason, in that case, for suffering our own statutory rules of descent to be innovated upon and actually superseded by a common law incident of the ancient feudal tenure. Indeed,

the learned judge, in his opinion in the case of *Dunn* v. *Evans*, informs us, that "to prevent the supposed evil of a shifting inheritance, in like cases, the Virginia statute of descents requires from the heir capacity of taking at the intestate's death." This common law doctrine seems thus to be admitted by the judge to be not only unsupported by reason in this country, but really an evil which requires to be eradicated by positive statute. I am unable, therefore, to perceive how it could be shown to have become the common law of this state, even though subordinate to statute law.

This court, in the case of *Kerwhacker* v. *C., C. & C. R. R. Co.*, 3 Ohio St. Rep. 176, in relation to the extent to which the common law of England is adopted as common law in this state, per Bartley, J., says: "The common law has continued to be recognized as the rule of decision, in the absence of legislative enactments, so far as its rules and principles appeared to be based on sound reason, and applicable to our condition and circumstances." And this is no doubt a very correct and fair statement of the circumstances and extent to which the common law of England is received in this state, as a rule of decision in our courts.

Our statutory rules of descent and distribution are based upon natural equity and affection, and have respect to nearness of kin. The English canons of descent were based mostly upon political considerations, disregarding natural equity and affection, and having respect to the building up and preservation of an aristocracy, a body of men having and retaining a large landed interest. Hence their law of primogeniture, actual seizin, exclusion of females, etc., is quite inconsistent with our institutions and policy.

It is true, in 1834, parliament abolished the rule requiring actual seizin in the intestate, and the rule preventing estates ascending to lineal ancestors; and in other respects, from time to time, the common law rules of descent in England have been somewhat modified and improved by statute, but the political and aristocratic character of the English laws of descent still remain. But even these statutory improvements do not at all affect or improve the common law inci-

Drake et al. *v.* Rogers.

dents of their system, which it is insisted must be regarded as engrafted upon, if not to some extent as superseding, our statutory laws of descent.

·But if the common law of England is to be recognized here, regardless of its reason and fitness, why not recognize the common law rules of descent, as well as their incidents? If the sixth canon of descents had been adopted by us, the effect would have been to exclude the half blood absolutely. Yet we have very properly rejected or refused to adopt any one of the canons, their tendency being manifestly to accumulate and monopolize lands and wealth in aristocratic lines; while our policy is rather to promote that equality of possession and privilege which is consonant to our form of government, and which seems dictated by principles of equity. Again, our policy is to restrict the entailment of estates; to recognize nothing like the feudal tenure; to regard the allodium the absolute proprietorship of lands, the same as that of personal property, as belonging to the individual seized in fee, and not as residing in the government. Our policy is to regard real estate, as well as personal, a proper subject of commerce, sale and exchange; and hence our laws have generally rejected all the rules and incidents of the English tenures calculated to hinder the transfer of lands.

· But this doctrine of shifting inheritances, while quite consonant to the feudal policy, is utterly opposed to ours, in that it fetters and ties up, in uncertainty, the title of lands. In the case of an application of the doctrine of shifting inheritances, the title may possibly remain in uncertainty many years, perhaps for half a century. In the meantime, the occupants, regarding themselves as possibly in the occupancy of lands not their own, will be deterred from making the permanent and valuable improvements which they otherwise would make; and perhaps suffer, if not commit, actual waste.

The reason of the law is said to be the life of the law, and being unable to perceive any reason upon which the common

law doctrine of shifting inheritances could have ever found any just application to the statutes of descent and distribution of this state, I can not regard the doctrine as properly appertaining to our law of descents; unless it be upon the mere authority of this case of *Dunn* v. *Evans.*

When we recur for authority to the other states, it is said that in all of the United States, no cases directly involving shifting inheritances are to be found, except in North Carolina, Indiana and this state. North Carolina had no general statute of descents, when the question arose there. The act of 1784 of that state had repealed the sixth and seventh canons of descent, the sixth of which excluded the half-blood. But it would seem that the act of 1784, was not intended or understood as furnishing statutory rules of descent, but only as amending their common law rules. Judge Daniels, of the supreme court of that state, in delivering the opinion in the case, *Doe* v. *Shephard,* 3 Murph. Rep. 327, clearly expressed such to be their understanding of their statute of 1784, in relation to descents. The following is his language: " The legislature never meant to change or alter *the stocks* or genealogical lines from what they were known to be at common law. The stocks and lines remain the same, with the addition of the half blood, when in those lines, together with the ascent of real estate in certain cases. * * * * * The preamble to the 3d section, complains only of the exclusion of the half blood from the inheritance; the section then lets in the half blood, but does not destroy the stocks or lines as established by the common law." *Ib.* 406.

The construction of this act of North Carolina, the act having been passed while the territory, now the state of Tennessee was part of North Carolina, arose in the case of *Nichol* v. *Dupree,* 7 Yerger, 415, in relation to the rights of half brothers and sisters in that case. Chief Justice Catron, in his opinion, speaks of the controversy in the courts of North Carolina, by the most distinguished lawyers of that state, for some twenty years, in relation to the construction of this statute, insisting, and for the most part successfully, that the statutes of 1784 should be construed in connection with the

common law canons of descent; and the judge speaks of this reasoning, after twenty years of litigation, as being found by the courts partly true, but mainly falacious.

Under these circumstances it was that in the case of *Cutlar* v. *Cutlar*, 2 Hawk. 324, the supreme court of North Carolina recognized the doctrine of shifting inheritances. And the court suffered brothers of the half blood, born respectively in 1798, 1801 and 1803, each to come in under this doctrine of shifting descents, as heirs to the intestate who died in 1797. And the legislature, shortly thereafter, provided by special statute as follows : " Rule 7. No inheritance shall descend to any person, as heir of the person last seized, unless such person shall be in life at the death of the person last seized."

The effect of the statutory rule of descents of the state of Virginia, upon the common law of descents prevailing in that state previous to the enactment of the statute, is thus expressed by Judge Pendleton, president judge of the court of appeals of that state, at the October term, 1800, of that court: " That the act of 1785, has totally done away the common law as to the course of descents, has not been nor can not be doubted. * * * Under this act it must be acknowledged that no possible case, not provided for, can happen, so as to let in the rule of the common law." *Brown and others* v. *Tuberville and others*, 2 Call. Rep. 340.

And in the case of *Davis* v. *Rowe*, 6 Randolph, 355, we find similar views expressed by the same court of appeals in 1828. Judge Carr, in his opinion in that case, says: " The question is how shall his estate be divided between these eleven relatives ? For the plaintiff, it is contended that our statute has no provision by which we can adjust the proportions of the claimants, that we must, therefore, call in the aid of the common law." And after speaking of the common law canons of descent, prevailing in Virginia until after the close of the revolution, when their statutes of descents were framed, as better suited to their actual situation, the judge expressed the opinion that the statute of descents had entirely superseded the common law rules. Judge Cabell, in the same case, says: " A change in the course of descents took

place as a necessary consequence of our change of govern ment. The change was effected by the act of 1785, chap. 60, which went into operation on the 1st of January, 1787. This act paid a due regard to the dictates of natural affection, and avoided the aristocratical tendencies of the former system," etc. And after referring to the various provisions of the statute, the judge adds : " As to the persons, or class of persons, therefore, who are to inherit, it may be justly inferred that the legislature intended to provide, by the act of 1785, a complete and perfect system, so as to render unnecessary and improper a reference to any other code or system of laws whatever." And the president judge, Brooke, in his opinion in the same case, said : " Our statute of descents, on which it must depend, appears to my understanding, to have enacted a course of descents, independent both of the common and civil law."

The state of Indiana has, like this and all, or most of the other states, a general statute of descents and distribution of intestate estates. The supreme court of that state, in a very recent case, *Cox* v. *Matthews*, not yet reported, as well as in the case of *Aldridge* v. *Montgomery*, 9 Ind. 302, have refused to recognize the common law rule of shifting inheritances, as law in that state. And this, notwithstanding the case of *Dunn* v. *Evans*, before then decided and reported, as the law of this state, under a similar statute of descents.

But it will be seen that our statute of 1853, differs somewhat from the statute of 1824, under which the case of *Dunn* v. *Evans* arose. The following are the material clauses of the statute of 1824 : " Sec. 1. That when any person shall die intestate, having title to any real estate of inheritance, lying and being in this state, which title shall have come to such intestate by descent, devise, or deed of gift from an ancestor, such estate shall descend and pass in parcenary to his or her kindred, in the following course : *First*, to the children of such intestate, or their legal representatives ; *second*, if there be no children, or their legal representatives, the estate shall pass to the brothers and sisters of the intestate who

may be of the blood of the ancestor from whom the estate came, or their legal representatives, whether such brothers and sisters be of the whole or of the half blood of the intestate ; *third*, if there be no brothers and sisters of the intestate of the blood of the ancestor from whom the estate came, or their legal representatives, and if the estate came by deed of gift from an ancestor who may be living, the estate shall ascend to such ancestor ; *fourth*, if the ancestor, from whom the estate came be deceased, the estate shall pass to the brothers and sisters of such ancestor, or their legal representatives, and for want of such brothers and sisters or their legal representatives, to the brothers and sisters of the intestate of the half blood or their legal representatives, though such brothers and sisters be not of the blood of the ancestor from whom the estate came ; *fifth*, if there be no brothers and sisters of the intestate or their legal representatives, the estate shall pass to the next of kin of the intestate of the blood of the ancestor from whom the estate came."

In the second clause of the first section of the act of 1853, under which this case arises, the word " living " is used, which is omitted in the act of 1824, making it now read, " that if there be no children *living*, the estate shall pass to the brothers and sisters of the intestate ;" and there are several other slight variations in the phraseology of the section less favorable to the construction given by the case of *Dunn* v. *Evans*, than was the language of the same section in the act of 1824.

But the following section and provision, which was not in the act of 1824, is contained in the revised act of 1853 : " Sec. 19. Descendants of the intestate, begotten before his or her death, but born thereafter, shall inherit in the same manner as if they had been born in the lifetime of the intestate, and had survived him or her."

To give this section any effect whatever, it must be implied that others than those mentioned in this section, born after the death of the intestate, can not inherit as if born before his death. Yet, the present defendant in error was not born

until about three years after the death of the intestate, from whom he claims to inherit.

While, therefore, some members of the court are of the opinion that the case of *Dunn* v. *Evans* is hardly sustained by either reason or authority, and ought not to be regarded as a correct exposition of the law, and would, therefore, be willing to overrule that case; others prefer to place the decision of this case upon the difference referred to between the statute of 1853 and that of 1824. But it is sufficient to say that for reasons satisfactory to each, and already sufficiently indicated, a majority of the court are of the opinion that the judgment of the court of common pleas should be reversed; and that judgment should be rendered in favor of the plaintiffs in error.

Judgment accordingly.

GHOLSON and BRINKERHOFF, JJ., concurred. PECK and SCOTT, JJ., dissented.